**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| URIAH FISH and KELLEY ROWAN, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>ENTRATA, INC.<br><br>Defendant. | Civil Action No. |

## CLASS ACTION COMPLAINT

Plaintiffs Uriah Fish and Kelley Rowan, *individually and on behalf of all other similarly situated individuals*, file this Class Action Complaint against Defendant Entrata, Inc. ("Defendant") and allege as follows:

## PRELIMINARY STATEMENT

1. Over the last decade, businesses have increasingly utilized "junk fees" to boost their profits. Junk fees are commonly defined as "add-on charges that provide little to no value in exchange" for the price. Luke Herrine, *Unfairness, Reconstructed*, 42 Yale J. on Reg. 95, 122 (2025). Businesses use these fees to slowly drive up the cost on consumers (and the profits for themselves)—often in an unfair, illegal and deceptive manner. As the Federal Trade Commission recently explained, "[m]isleading fees are prohibited," and businesses "can't lie about the fees you charge."[1] Instead, businesses must "[t]ell the truth when it comes to fee-related information that matters, like what's being charged and why." *Id.*

[1] Federal Trade Commission, *Getting to the bottom line: The FTC's bipartisan Junk Fees Rule and your business*, available at: https://www.ftc.gov/business-guidance/blog/2024/12/getting-bottom-line-ftcs-bipartisan-junk-fees-rule-your-business.

2. This case arises because Defendant Entrata, Inc. ("Defendant" or "Entrata"), lies about the fees that it charges to tenants, charges them for services they do not receive, and sells a credit repair product without providing consumers with information required by the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j, the Colorado Credit Services Organization Act ("CCSOA") C.R.S. § 5-19-101 *et seq.*, and the Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101 *et seq.*

3. More specifically, Defendant is a company that offers a product called RentPlus. When tenants sign a lease with their property management company ("PMC") or landlord, many of those leases include a RentPlus Lease Addendum drafted by Defendant—claiming that "[t]he RentPlus service is a credit reporting and financial tool" that reports "rent and/or utility payments" to the major credit bureaus: Equifax, TransUnion, and Experian. Defendant further touts its product as "an amenity provided by the property" to tenants, who are charged $8.95 per month for RentPlus to purportedly improve their credit scores.

4. In reality, however, these are untrue and deceptive statements regarding the services provided by RentPlus for several reasons. One, while Defendant positions its product as a benefit to tenants, PMCs receive a significant kickback each month for luring unsuspecting tenants into enrolling in RentPlus. Defendant's addenda create the appearance that Defendant's product is truly a third-party service and amenity that provides benefits to tenants—rather than an inflated fee used to compound the rent burden on low and middle-income Americans. Moreover, many landlords already report all payment activity—both positive and negative—to major credit reporting companies, which provide reports to landlords for use in making rental decisions.

5. Consistent with the untrue and deceptive statements in the standard addendum, Defendant's marketing materials further demonstrate its intent to lure unsuspecting tenants into

enrolling in RentPlus. By way of example, on rentplus.com, Defendant's website targeted towards tenants, Defendant states: "Building your financial future begins with a solid credit score. Luckily, RentPlus simplifies establishing credit by allowing renters to build their scores. We track your progress through rent reporting, so when you pay your rent on time, your payments will do the rest." Elsewhere on the website, RentPlus advertises: "Boost your credit score with our renter-focused financial services program!" and that RentPlus "[a]llows renters to build and improve their credit by ensuring timely rent and utility payments." RentPlus also tells tenants: "RentPlus can help residents establish a payment history. If you are late with a rental payment, we won't report it so that your credit isn't impacted negatively!"

6. Defendant makes very different representations to landlords and property management companies about the financial benefits of having tenants enroll in RentPlus. While RentPlus pitches tenants on how RentPlus can improve their credit, it pitches RentPlus to PMCs as an opportunity to increase their income through a kickback of RentPlus fees. On rentdynamics.com, which is Defendant's website targeted towards PMCs, Defendant tells PMCs how RentPlus creates "ancillary revenue opportunities" for PMCs, including a calculator that shows how much additional money PMCs that adopt RentPlus can earn from their tenants. The calculator shows that a PMC with 10,000 units should expect an annual revenue of $576,000 and a total of $9,600,000 in "ancillary revenue" after adopting RentPlus.

7. Tenants are not informed of this kickback and do not know that PMCs are getting paid for signing them up for RentPlus.

8. Compounding the deception, tenants are automatically enrolled in RentPlus and must affirmatively opt out to avoid being charged for it. When this automatic enrollment is disclosed to tenants at all, it is generally buried within lengthy lease documents that can run to 50

pages or more. RentPlus's opt-out process further compounds the problem by requiring tenants to navigate a multi-step unenrollment procedure, leaving many tenants to report that, even when they are aware of and want to opt out of the charge, they are unable to.

9. The RentDynamics website explains to PMCs that the "opt-out" nature of RentPlus is a significant driver of the product's profitability. Prior to August 2020, RentPlus was offered through "opt-in" enrollment. However, approximately five years ago, Defendant began auto-enrolling tenants and only providing them with the option to opt *out* of the service instead. This is sometimes called a "negative option."

10. Defendant boasts to PMCs that when it made this switch to the negative option and stopped allowing renters to affirmatively *choose* to purchase RentPlus, enrollment soared from approximately 16% of renters in its customer properties to nearly 80%. This indicates that, when presented with a choice, consumers generally do not want or need the service RentPlus purports to provide.

11. While rentdynamics.com contains lots of information about the negative option in order to sell PMCs on the kickback scheme, it is not mentioned on the rentplus.com website geared to tenants at all.

12. The consequences to tenants of paying for a product that they don't want or use can be significant. The fee for RentPlus is at least $8.95 (for one person) or $14.95 (for two or more people) monthly, totaling over $100 each year. Tenants are charged for RentPlus at the beginning of each month at the same time they are charged for rent, and these charges continue throughout the tenancy unless the tenant affirmatively cancels. These fees are substantial, especially when considering that the product itself is premised on and targeted to people struggling with credit concerns and financial well-being.

13. Plaintiffs allege that Defendant's representations (and lack thereof) about RentPlus violate the law in three ways. *First*, RentPlus is a credit repair organization regulated under the CROA and the CCSOA that fails to comply with the requirements under those laws, which prohibit making or using untrue, misleading, or deception in connection with the offer of services of a credit repair organization. Defendant violates this section by creating an appearance that tenants are paying a neutral third-party a monthly service fee to improve their credit when, in reality, PMCs receive a significant kickback each month for luring unsuspecting tenants into enrolling in RentPlus. *Second*, Defendant violates the CROA by imposing fees upon renters in advance of fully performing the promised services and failing to make mandated disclosures. And *third*, Defendant's representations (or lack thereof) to tenants, including the negative option scheme, are deceptive under CROA and Colorado's prohibition on unfair and deceptive acts and practices.

14. Plaintiffs bring this case to seek relief from Defendant's ongoing violations of the CROA, CCSOA, CCPA, and Colorado law.

## **PARTIES**

15. Plaintiff Uriah Fish ("Mr. Fish") was initially enrolled in RentPlus from December 2020 to November 2024, and again through a negative option provision in his residential lease from December 2024 to the present.

16. Plaintiff Kelley Rowan ("Ms. Rowan") was enrolled in RentPlus through a negative option provision in her residential lease from January 2026 to April 2026.

17. At all times relevant to this action, Mr. Fish and Ms. Rowan were consumers within the meaning of the CROA 15 U.S.C. § 1679a(1) and buyers within the meaning of the CCSOA C.R.S. §5-19-103 (together "consumers").

18. Defendant Entrata is a privately-held software company with its principal place of business in Lehi, Utah.

19. Entrata owns and operates RentPlus by RentDynamics, a rent-reporting service marketed as improving consumers' credit scores and credit histories.

20. At all times relevant to this action, Entrata was a credit repair organization within the meaning of the CROA 15 U.S.C. § 1679a(3) and a credit services organization within the meaning of the CCSOA § 5-19-103 (together, "CRO").

21. At all times relevant to this action, Entrata was an enterprise engaged in interstate commerce within the meaning of the CROA, 15 U.S.C. § 1679a(3)(A).

## JURISDICTION & VENUE

22. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over all Counts under the CROA because they arise under the laws of the United States.

23. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. The state-law claims arise from the same nucleus of operative facts as the federal claim, including Defendant's common course of conduct described herein.

24. This Court has personal jurisdiction over the parties because Defendant transacts business in, and this action arose from transactions conducted in Colorado.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to this claim arose from transactions conducted in this district.

## STATEMENT OF FACTS

***Credit Repair Organizations Act and Colorado Credit Services Organization Act Background***

26. Congress passed the CROA more than thirty years ago in response to "[c]ertain advertising and business practices of some companies engaged in the business of credit repair services [that] have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters."

27. Congress recognized that "consumer concern about the impact of poor credit had created fertile ground for the growth of fraudulent business models that offered an illusory 'quick fix' to credit problems at a substantial price." The legislative history of the Act expresses particular concern over "companies that lead consumers to believe that the companies can 'repair' bad credit histories," but "have bilked consumers [out] of millions of dollars . . ."

28. The protections of CROA were intended to be twofold: "to ensure that prospective buyers of [these] services . . . are provided with the information necessary to make an informed decision regarding the purchase of such services"; and "to protect the public from unfair or deceptive advertising and business practices" by these companies. 15 U.S.C. § 1679(b).

29. The CROA defines a CRO broadly to include "any person who uses any instrumentality of interstate commerce or the mails to sell, provide or perform [or represent that it will] any service, in return for the payment of money . . . for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to [such activity]." 15 U.S.C. §1679a(3)(A).

30. To protect consumers from spending money on services that would not, in fact, improve their credit, the CROA expressly prohibits CROs from charging advanced fees "for the performance of any service which the [CRO] has agreed to perform . . . before such service is fully

performed." 15 U.S.C. §1679b(b). This prohibition reflects Congress's determination that advance fees expose consumers to substantial financial harm by requiring payment before any measurable benefit is delivered, particularly where the promised service may be ineffective or never performed at all.

31. To further safeguard the public from unfair or deceptive practices, the CROA also prohibits CROs from "engag[ing] directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of . . . a fraud or deception on any person in connection with the offer or sale of the services of the [CRO]." 15 U.S.C. §1679a(4).

32. The CROA also mandates that CROs provide specific, affirmative disclosures to consumers, furthering Congress's goal of ensuring that consumers receive the information necessary to make informed decisions before purchasing credit-repair services. *See* 15 U.S.C. §1679c.

33. As the Federal Trade Committee has noted, there "is broad definition of a [CRO] to which CROA applies, [therefore] CROA prevents entities offering credit repair services from evading the law."

34. In 2017, the Colorado General Assembly enacted the CCSOA as a state-level consumer protection, declaring that "credit has become of great importance to consumers" and "[a]s a result, consumers who have experienced credit problems may seek assistance from credit services organizations that offer to obtain credit or improve the credit standing of consumers." C.R.S. § 5-19-102(1)(a).

35. The General Assembly further declared that "[c]ertain advertising and business practices of some credit services organizations have worked a financial hardship upon the people of [Colorado], often those who are of limited economic means and inexperienced in credit

matters," and that these practices "hav[e a] significant impact upon the economy and well-being of [Colorado] and its people." C.R.S. § 5-19-102(1)(b).

36. The purpose of the CCSOA is consequently "to provide prospective buyers of services of credit services organizations with the information necessary to make an intelligent decision regarding the purchase of those services and to protect the public from unfair or deceptive advertising and business practices." C.R.S. § 5-19-102(1)(c).

37. In order to best protect Colorado consumers from predatory credit services organizations, the General Assembly declared that the CCSOA "be construed liberally to achieve these purposes." C.R.S. § 5-19-102(1)(e).

38. The CCSOA largely parallels the protections found in the CROA, including the prohibition against advanced fees, the requirements of specific disclosures, and the prohibition of deceptive business practices.

***Defendant's Express and Implied Representations about Improving Consumers' Credit Place It Squarely in the Ambit of CROA and CCSOA***

39. Defendant owns and operates RentPlus, which it markets to tenants as a service that improves consumers' credit scores and establishes credit history by reporting on-time rental payments to credit bureaus.

40. Indeed, on RentPlus's website, "Rent Reporting" is the only service listed in the drop-down menu labeled "Programs."

41. Consumers pay a monthly, automatically recurring fee for RentPlus along with their regular rent and utility bills as a lease or amenity charge. The amount Defendant charges consumers varies depending on the consumer's rental management company, but is generally $8.95 for a single renter and $14.95 for two or more renters.

42. Defendant states that its credit-improving services work by 1) consumers paying their monthly rent on time, 2) RentPlus working with property owners or landlords to report consumer's rental payment to select credit bureaus, and 3) credit bureaus recording monthly rental payments on consumers' credit reports which will begin to build their credit profile. In short, Defendant promises that in exchange for monthly and continuous fees, they will improve consumers' credit.

43. Rentplus.com states that RentPlus will also "…automatically back report any available history (up to 24 months) that is on [consumers'] lease" to improve consumers' credit histories.

44. Defendant makes various representations on rentplus.com that the purpose of RentPlus is to increase consumers' credit scores and improve their credit history through rent reporting services.

45. For example, Defendant invites consumers on its RentPlus website to "Start improving your credit score today." Elsewhere, it states that RentPlus will "[b]oost [consumers'] credit score[s] with our renter-focused financial services program! We make it simple for you to increase your credit score by paying your regular rent and utility bills."

46. Defendant also promises consumers that RentPlus will "[b]uild your credit by paying your monthly rent on time! Securing your financial future begins with a solid credit score. Luckily, RentPlus simplifies establishing credit by allowing renters to build their scores. We track your progress through rent reporting, so when you pay your rent on time, your payments will do the rest."

**Build your credit by paying your monthly rent on time!**

Securing your financial future begins with a solid credit score. Luckily, RentPlus simplifies establishing credit by allowing renters to build their scores. We track your progress through rent reporting, so when you pay your rent on time, your payments will do the rest.

47. Defendant further represents on its RentPlus website that the purpose of RentPlus is "…to aid renters in improving their credit through credit-building programs" and that RentPlus can provide and perform the service of rent reporting and "credit building programs for renters" that will establish consumer credit and boost consumer credit scores.

48. The RentPlus website claims that "utilizing a program like RentPlus is one of the safest and easiest ways for to establish credit."

49. The RentPlus website promises tenants a myriad of "Benefits of Using RentPlus," including "Increased Credit Card Limits," "Improved Loan Approval Rate," "Lower mortgage and refinancing rates," "Lower auto/boat/rv/atv rates," "More negotiating power," "Better car insurance rates," and "Getting a job."

50. Under "Improved Loan Approval Rates," RentPlus states:

> Build a high credit score with our credit-building programs for renters that can also help you improve your chances of being approved for a loan. Of course there are some other factors as well, such as income and current debt, but your approval rates will still be much better.

51. In its website FAQs, Defendant claims that RentPlus "users see an average score increase of 20-40 points after being enrolled for a year!"

52. These representations leave tenants with the overall impression that RentPlus's rent-reporting services will improve consumers' credit records, credit histories, and credit ratings.

***Defendant Deceives Consumers About RentPlus's Landlord Kickback Scheme***

53. Defendant typically lures tenants into using RentPlus through their PMCs or landlords.

54. At the moment when tenants go to sign a lease, they are presented with a standard addendum claiming that "[t]he RentPlus service is a credit reporting and financial tool" that reports "rent and/or utility payments" to the major credit bureaus: Equifax, TransUnion, and Experian.

55. The standard addendum further proclaims that RentPlus is "an amenity provided by the property" to tenants, who are charged $8.95 per month for RentPlus.

56. Consistent with these representations, on Defendant's rentdynamics.com website, which is targeted to PMCs, touts RentPlus as offering "… new revenue opportunities. The potential for an annual income of up to $10k MRR is groundbreaking. Use our revenue calculator to estimate your earnings. A WIN for PMCs!"

57. On the revenue calculator website page, Rent Dynamics invites PMCs to "Build Ancillary Revenue with RentPlus . . . Your properties can increase their bottom line while increasing their resident satisfaction."

58. The revenue calculator's default settings displays that if a PMC owns 10,000 units, with an average of two roommates per unit, and a cap rate at 6%, they can earn $48,000 in monthly RentPlus Revenue, $576,000 annual revenue, adding $9,600,000 total value added.




59. One graphic on the Rent Dynamics website displays that at one participating property, 82% of residents participate in RentPlus, giving the property $13,532 annual ancillary income, 2x more credit score points increased vs. comparable properties, and $386,622 added to purchase price. Another graphic reports that a PMC with two properties generated $23,311 in revenue annually and generated an additional $650,946 to the purchase values of properties as a result of using RentPlus.



## BENEFITS OF RENTPLUS

1

**Annual Ancillary Revenue**

RentPlus generated significant ancillary revenue across both properties ($23,311 annually across both Broadmoor Village and Falls at Hunter's Pointe).

2

**Increased Property Purchase Value**

Broadmoor Village sold at a cap rate of 3.5%, and Falls at Hunter's Pointe sold at a cap rate of 3.7%. RentPlus generated an additional $650,946 to the purchase value across both properties.

60. Defendant does not disclose to tenants that PMCs earn money when they enroll in RentPlus anywhere on rentplus.com, the website that is targeted at renters. Upon information and belief, most renters are unaware of this fact.

***Defendant Charges Consumers Advanced Fees***

61. Recognizing the potential for abuse of desperate people, the CROA and the CCSOA prohibit CROs from charging for credit repair services before they have been fully performed. 15 U.S.C. § 2679b(b); C.R.S. § 5-19-104. Defendant violates this requirement.

62. First, Defendant charges consumers for its credit improvement services at the same time consumers' PMCs charge them for rent. (Generally, on the first of each month.) This means that, by definition, the charge occurs before the reporting of the on-time rent payment—the rent has not even been *paid* at the time of the charge, much less reported.

63. Second, Defendant does not report the payments to credit bureaus until "around the 15th-20th of each month," despite charging for the reporting on the first of the month.

64. Third, any possible positive impact from the reporting comes even later. On the RentPlus FAQ page, in response to the question "Why can't I see any RentPlus reporting?" Defendant states that "[I]t can take up to 45 days to see your reporting appear on your score and in your RentPlus Residential Portal. This is due to the delay in receiving your information from your community and the reporting dates of the credit bureaus."

65. Fourth, during months that a tenant is late with rent, and therefore RentPlus does not provide any data at all to the credit bureaus, RentPlus still charges the standard monthly fee.

***Defendant Does Not Make Required Disclosures***

66. The CROA and CCSOA requires CROs to provide consumers with a specific, lengthy disclosure as to their rights under the law. Among other things, these disclosures inform consumers about their rights to dispute inaccurate information on their credit report, obtain their credit report directly from a credit bureau, sue a CRO that engages in deceptive practices, cancel a contract with a CRO within three days of signing it, and dispute a credit report directly with a credit bureau. 15 U.S.C. § 1679c.

67. These disclosures are required to be a separate statement from any contract with the CRO. Defendant does not provide these disclosures.

68. In addition, the CCOSA requires CROs to obtain the signature of the buyer, list the date of enrollment, list the total of all payments to be made by consumers, include a full and detailed description of rent reporting, and include a "Notice of Cancellation" in a specific form. Defendant does none of this.

69. As set forth in CROA's Findings and Purposes section, Congress intended the statute to ensure that "prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purpose of such

services." 15 U.S.C. § 1679 (b)(1). The disclosure requirement in the statute reflects findings that disclosures like the ones CROA requires have been shown to change consumers' financial behavior, making them a critical tool for ensuring fully informed consumers.[2]

70. By failing to provide the required disclosures, Defendant unlawfully denies consumers the opportunity to make an informed choice about whether to pay for RentPlus's services in any given month or at all and violates key protections required by the CROA and the CCSOA.

***Defendants' Unlawful and Deceptive Autoenrollment Practice***

71. Defendant, through participating landlords, automatically enrolls consumers in RentPlus through a negative option lease provision. "Negative option billing" is a term used when "customers must opt out to stop charges [on their credit cards] rather than opting in to approve them." *Forby v. One Techs., L.P.*, 13 F.4th 460, 462 (5th Cir. 2021).

72. Defendant began implementing its auto-enrollment scheme in August 2020 to increase consumer enrollment in RentPlus.

73. A chart on the RentPlus website displays that consumer enrollment at one housing complex increased from about 100 residents in July 2020 to nearly 600 residents by August 2020 when it implemented the negative option scheme.

[2] Ann Carrns, *Disclosures Are Found to Change Financial Behavior*, The New York Times, February 22, 2012, *available at* https://archive.nytimes.com/bucks.blogs.nytimes.com/2012/02/22/disclosures-are-found-to-change-financial-behavior/




74. Defendant's PMC-facing website, rentdynamics.com, includes testimonials from several PMCs stating that when RentPlus switched enrollment from opt-in to opt-out, the proportion of tenants that pay for RentPlus increased exponentially.

75. Participating PMCs note that "Having the auto-enroll model has definitely been great for [PMCs] financially and from a management perspective. I think that [Rentplus] is something so small and can't hurt [tenants] in any way. . . . When it was an add-on it was harder for my leasing agents, but when it's auto-enroll and residents are told upfront in their tour that it's part of their cost and that they can exclude [themselves] if [they] want to, they usually don't have any more questions."

76. Another PMC wrote, "[Landlords] are really thrilled with it. Often times, our secondary charges are justified, but are not always the easiest to sell to residents. This is something that we're able to accomplish on our end (grow other income) while also providing a service to the resident. . . . Having the auto-enroll model has definitely been great of us [landlords] financially."

77. Defendant implements its autoenrollment scheme by burying a RentPlus addendum in consumers' residential leases (if a contract is provided at all). When consumers sign lease or lease renewal agreements, participating landlords will insert a provision automatically enrolling consumers in RentPlus.

78. The only affirmative action required of consumers prior to automatic enrollment is signing their lease, a step inherent in their rental process. However, to opt-out of RentPlus, consumers must visit my.rentplus.com/auth/login. Consumers then click "Cancel account." Consumers must then type in their email address and then click "Send Email." An email is then sent to the consumer with a cancelation link. Consequently, consumers must take at least five steps to cancel RentPlus services after taking no affirmative steps to enroll. The url address Defendant provides consumers in their lease agreements does not always work properly.

79. Sometimes consumers' residential leases provide a mailing address and email for consumers to cancel their enrollment, but they do not include clear steps on how to complete cancellation.

80. Because Defendant, through participating property management companies and landlords, ("PMCs"), burry the negative option provision in consumers' leases, many consumers are unaware that they are being charged for RentPlus or are participating in its services. Once enrolled, consumers do not always review their credit card statements or notice Defendant's charges for RentPlus, particularly when they are already expecting other routine rent-related charges.

81. Public comments reveal consumers' dissatisfaction with Defendant's deceptive practices. For example, comments on the Better Business Bureau website include:

- "I never subscribed to this service and now I have this nonsense in my credit report. . . "

- "My apartment property management company recently added a sheet at the end of lease agreements called "RentPlus . . . this whole situation is ridiculous, slimy, and predatory for gaining paid subscriptions . . ."
- "I did not enroll, agree to nor sign up with Rent Dyanmics/RentPlus . . . The charge was added without my knowledge. I was not informed . . ."
- "I was subscribed automatically into this program via a renewal agreement with hidden verbiage. This should be an opt in program and not an opt out program . . ."

82. Defendant does not require or verify that PMCs verbally explain to potential renters that RentPlus is optional or directly explain to consumers they will be automatically enrolled. Consumers are not always informed that a charge for RentPlus is optional on their lease.

### ***Plaintiff Uriah Fish was Auto Enrolled in RentPlus, Charged Advanced Fees, and Did Not Receive Required Disclosures***

83. Plaintiff Uriah Fish is a resident of Northglenn, Colorado. He receives federal rental assistance via the Housing Choice Voucher program.

84. Mr. Fish has been enrolled in RentPlus by the past two apartment complexes where he has lived.

85. Between December 2015 and December 2024, Mr. Fish lived in the Vega apartment complex in Northglenn, Colorado.

86. Sometime in 2020, Vega began including Defendant's negative option lease provisions for RentPlus in residents' lease agreements.

87. On or around September 1, 2021, Vega provided Mr. Fish a lease-renewal agreement consisting of over 50 pages with 19 addenda printed in small, compact text. The agreement included a "RentPlus Addendum" buried towards the end of the lease on page 46. The addendum was one of 19 additional lease provisions, which otherwise governed things such as

utility costs, move in/move out provisions, and parking rules. The text of the RentPlus enrollment provision was written in the same size, color, and font as the housing-related terms on the lease.

88. The RentPlus addendum enrolled Mr. Fish in RentPlus. In order to opt out, the addendum stated, he would have to log into the RentPlus website and agree to the terms and conditions found there. The addendum did not state that enrollment in RentPlus is optional.

89. Mr. Fish did not receive any separate or conspicuous notice that he had been enrolled in RentPlus.

90. After Mr. Fish signed the lease renewal, he was charged $8.95 each month, which is over $100 each year, despite being unaware that he had been enrolled in the provision. Defendant charged Mr. Fish for this fee on the first day of each month.

91. A similar "RentPlus Addendum" was buried in the subsequent lease renewals Mr. Fish signed while a tenant at Vega.

92. Mr. Fish continued to be charged for RentPlus for the remainder of his tenancy at Vega.

93. Pursuant to RentPlus's terms of use, Mr. Fish's enrollment in RentPlus was terminated when he terminated his tenancy at Vega.

94. In September 2024, Mr. Fish moved from the Vega to Carrick Bend. He does not recall that his lease disclosed that Carrick Bend uses RentPlus. However, Mr. Fish was automatically enrolled in RentPlus again.

95. His rent at Carrick Bend is $1,664 a month, plus several add-on fees for services including a "Trash Removal Fee," a "Trash Hauling Fee," and a "Valet Trash Service Fee," as well as RentPlus.

96. On December 10, 2024 Mr. Fish Received an email from RentPlus titled "RentPlus + Carrick Bend" stating "We are excited to welcome you to RentPlus! We are sure you are going to love it. In fact, 95% of RentPlus members would refer a friend. Sit back and relax, because all you have to do is pay your rent and we will report your monthly payments to the credit bureaus . . . " The email also stated, "Access your RentPlus account below, and let RentPlus make a positive difference to your credit and your financial future."

97. Defendant did not include any of the written disclosures required by 15 U.S.C. § 1679c and C.R.S. § 5-19-106 on the Vega and Carrick Bend lease addendums signed by Mr. Fish.

98. Defendant did not include any conspicuous statements in bold-faced type that explained the cancelation process of RentPlus in immediate proximity to any spaces reserved for Mr. Fish's signature.

99. Defendant did not include any language indicating the total of all payments to be made by Mr. Fish to Defendant or a participating landlord.

100. Defendant did not include an accompanying form captioned "Notice of Cancellation" in the lease agreements enrolling Mr. Fish in RentPlus.

101. Mr. Fish has been charged $9.95 a month for RentPlus at Vega from March 1, 2025 to the present.

102. The charge that appears on his rental ledger clearly states that the charge on the first of the month is for services provided in that following month. For example, as the screenshot below shows, the April 2025 entry appeared on his ledger on April 1, 2025 and reads: "RentPlus for 04/01/2025-04/31/2025."

| | | | | | | |
|---|---|---|---|---|---|---|
| 04/01/2025 | electric | Electric to Tenant - 02/01/25-02/28/25 | 15.08 | | 3,568.60 | 20187787 |
| 04/01/2025 | gas | Gas to Tenant - 02/01/25-02/28/25 | 54.98 | | 3,623.58 | 20187788 |
| 04/01/2025 | trashfee | Trash Removal Fee - 02/01/25-02/28/25 | 17.91 | | 3,641.49 | 20187789 |
| 04/01/2025 | utilbill | Utility Billing Fee From Resident - 02/01/25-02/28/25 | 10.00 | | 3,651.49 | 20187790 |
| 04/01/2025 | water | Water and Sewer to Tenant - 02/01/25-02/28/25 | 33.78 | | 3,685.27 | 20187791 |
| 04/01/2025 | rent | Rent (04/2025) | 1,664.00 | | 5,349.27 | 20362634 |
| 04/01/2025 | trashfee | Trash Hauling Fee (04/2025) | 10.00 | | 5,359.27 | 20363061 |
| 04/01/2025 | valetrsh | Valet Trash Service Fee (04/2025) | 15.00 | | 5,374.27 | 20363062 |
| 04/01/2025 | pestfee | Pest Control Fee (04/2025) | 5.00 | | 5,379.27 | 20363376 |
| 04/01/2025 | packgfee | Package Service Fee (04/2025) | 18.00 | | 5,397.27 | 20363667 |
| 04/01/2025 | Rentplus | RentPlus for 04/01/25-04/30/25 | 9.95 | | 5,407.22 | 20409799 |
| 04/01/2025 | insuranc | Insurance Premium (Coverage 2/20/25 - 3/19/25) | 21.00 | | 5,428.22 | 20455319 |

103. Mr. Fish is charged monthly for RentPlus regardless of whether he makes an on-time payment that month, or whether that month's information is reported as paid on time on his primary credit report with one of the major credit bureaus.

104. A September 2025 credit report from Equifax, for example, shows that Mr. Fish paid his rent on time in January, February, and May of 2025. The remainder of the months are classified as "No Data Available." However, the 24-month history shows that in 02/25 and 03/25, Mr. Fish's scheduled payment amount was $1,674 and he actually paid $143. The history does not show any payment amount for 04/25.

105. Mr. Fish's rental ledger for January through May 2025 shows that he paid $1,664 for rent on January 6, 2025, $308 for rent on February 25, 2025, nothing in March or April, and $4,107.86 on May 27, 2025.

106. The September 2025 Equifax report does not appear to contain any information about rental payments after May 2025. The report shows 06/30/2025 as the last "date reported."

107. A screenshot of this report is below:

**Payment History**

| Year 2025 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ✓ | ✓ | ▪ | ▪ | ✓ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ✓ | Paid on Time | 30 | 30 Days Past Due | 60 | 60 Days Past Due | 90 | 90 Days Past Due | 120 | 120 Days Past Due |
| 150 | 150 Days Past Due | 180 | 180 Days Past Due | V | Voluntary Surrender | F | Foreclosure | C | Collection Account |
| CO | Charge Off | B | Included in Bankruptcy | R | Repossession | TN | Too New to Rate | ▪ | No Data Available |

**24 Month History**

| | Balance | Scheduled Payment Amount | Actual Payment Amount | Last Payment Date | Past Due Amount | High Credit | Credit Limit | Narrative Codes |
|---|---|---|---|---|---|---|---|---|
| 05/25 | $0 | $1,683 | $3,927 | 05/27/2025 | ▪ | $1,683 | ▪ | 267 |
| 03/25 | $0 | $1,674 | $143 | 02/25/2025 | ▪ | $1,674 | ▪ | 267 |
| 02/25 | $0 | $1,674 | $143 | 02/25/2025 | ▪ | $1,674 | ▪ | 267 |
| 01/25 | $0 | $1,664 | $1,338 | 01/06/2025 | ▪ | $1,664 | ▪ | 267 |
| 12/24 | $0 | $1,341 | $2,009 | 12/26/2024 | ▪ | $1,341 | ▪ | 267 |

| Narrative Code | Narrative Code Description |
|---|---|
| 267 | Rental Agreement |

108. Meanwhile, all of Mr. Fish's rental payment information appears on his Experian RentBureau report, regardless of whether his payment was made on time or not. A screenshot of his RentBureau report for Carrick Bend from August 2025 shows several months of late payments:

| | | | | | |
|---|---|---|---|---|---|
| Rating | 3 | Dispute Indicator | | Dispute Text | 2052-2900-424939 |
| Last Activity Date | 2025-08-01 | Rent | 1664.00 | Total Rent Paid | |
| Total Rent Write-offs | 0.00 | Total Non Rent Write-offs | 0.00 | Total Write-offs | 0.00 |
| Number Late | 6 | Number NSF | 0 | LMO | N |
| Number of Leases | 1 | Total Outstanding | 0.00 | | |

Inquiries - Rent Requests

| Inquiry Date | Member Name | Purpose | Requester Company Name |
|---|---|---|---|
| 2024-09-24 | RentGrow | RENT | Berkshire Group, L.L.C. |

Aggregated Information

Aggregated NSF History (NSF Count/NSF Amount)

| 2025-2024 | August | July | June | May | April | March | February | January | December | November | October | September |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 0.00 | 0 0.00 | 0 0.00 | 0 0.00 | 0 0.00 | 0 0.00 | 0 0.00 | 0 0.00 | 0 0.00 | NA NA | 0 0.00 | |

Aggregated Payment History (Payment Count/Payment Amount)

| 2025-2024 | August | July | June | May | April | March | February | January | December | November | October | September |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 1509.00 | 1 2099.00 | 1 2598.86 | 1 3018.00 | 0 0.00 | 1 3326.00 | 0 0.00 | 1 2916.07 | 1 1289.58 | NA NA | 0 0.00 | |

***Plaintiff Kelley Rowan was Auto Enrolled in RentPlus, Charged Advanced Fees, and Did Not Receive Required Disclosures***

109. Plaintiff Kelley Rowan is a resident of Golden, Colorado.

110. She was auto-enrolled in RentPlus through a negative option provision in her lease agreement with Aurum Apartments in January 3, 2026.

111. At the beginning of Ms. Rowan's lease, there is a chart that lists "Additional Charges." The chart identifies additional charges as "mandatory," "optional," or "incidental." The chart also lists who receives the payment. RentPlus is not listed as an additional charge on the chart.

**2. Additional Charges – Not Included in Total Monthly Cost of Rental**

| Charge Type | Mandatory/ Optional/ Incidental | Amount | Fixed or Variable? | Refundable | Recipient |
|---|---|---|---|---|---|
| Security Deposit | Mandatory | $ 500.00 | Fixed | Yes | Landlord |
| Late Fee | Incidental | $ 50 | Fixed | No | Landlord |
| NSF Fee | Incidental | $ 20.00 | Fixed | No | Landlord |
| Key FOB | Mandatory | $ 50 | Fixed | No | Landlord |
| Lock Change/Rekey | Mandatory | $ 75 | Fixed | No | Landlord |
| Mailbox key | Mandatory | $ 10 | Fixed | No | Landlord |
| Premium Reserved Parking | Optional | $ 50 | Fixed | No | Landlord |
| Add Parking Pass | Optional | $ 25 | Fixed | No | Park M |
| Replacement Parking Pass | Mandatory | $ 25 | Fixed | No | Park M |
| Carpot | Optional | $ 100 | Fixed | No | Landlord |
| Lease Termination Fee | Incidental | $ varies | Fixed | No | Landlord |
| Pet Deposit | Optional | $ 300 | Fixed | No | Landlord |
| Pet Rent | Optional | $ 35 | Fixed | No | Landlord |
| Application Fee | Mandatory | $ 19.45 | Fixed | No | Landlord |
| Administrative Fee | Mandatory | $ 350 | Fixed | No | Landlord |
| 300 MBPS Internet | Optional | $ 75 | Fixed | No | Landlord |
| 1000 MBPS Internet | Optional | $ 75 | Fixed | No | Landlord |
| Package Fee | Mandatory | $ 25 | Fixed | No | Landlord |

112. The rest of Ms. Rowan's January 2026 lease is over 80 pages long and primarily contains housing-related terms.

113. The RentPlus lease addendum is buried within the lease, on page 72 in small text.

114. The addendum describes RentPlus as "…a credit reporting and financial tool provided by Simplified Business Group, LLC, doing business as Rent Dynamics ("Rent Dynamics"), to report Residents rent and/or utility payments…by signing this addendum, Resident will be enrolled." The addendum later states that enrolment is optional.

115. The addendum also states that a "[r]esident may cancel by sending written notice of termination to Rent Dynamics . . . Resident must cancel no later than ten (10) days before the end of the month to avoid being charged for a subsequent month."

116. When Ms. Rowan signed the lease at the Aurum leasing office, she was presented the lease on her phone through a program that automatically took her through each provision before adding her electronic signature next to each provision. However, the program skipped over the page of the lease that contained the RentPlus provision. Therefore, Ms. Rowan did not sign the addendum and did not know she had been enrolled in RentPlus.

117. Ms. Rowan discovered she had been automatically enrolled in RentPlus, without her knowledge or consent, on February 5, 2026, when she received an email from noreply@rentplus.com stating, "We are excited to welcome you to RentPlus! . . . Sit back and relax, because all you have to do is pay your rent and we will report your monthly payments to the credit bureaus . . ." That same day, Ms. Rowan received an additional email from Defendant stating, "We're excited to inform you that . . . you now qualify for the household charge of $14.95 . . . This will continue to be billed through Aurum."

118. Defendant charged Ms. Rowan $14.95 on March 1, 2026, the same day she paid her rent and consequently before any rent reporting or credit-improving service could have been performed.

119. Despite paying her rent on time and paying RentPlus's monthly fee for rental reporting, Ms. Rowan's credit reports from TransUnion, Equifax, and Experian do not show any rent payment history.

120. Defendant did not include any of the language required for written disclosures expressly listed in 15 U.S.C. § 1679c in Ms. Rowan's lease agreement with Aurum.

121. Defendant also did not include any of the language required for written disclosures expressly listed in C.R.S. § 5-19-106 in Ms. Rowan's lease agreement with Aurum.

122. Defendant did not include any conspicuous statements that explained the cancelation process for RentPlus in bold-faced type, in immediate proximity to any spaces reserved for Ms. Rowan's signature.

123. Defendant did not include any language indicating the total of all payments to be made by Ms. Rowan to Defendant or a participating landlord in Ms. Rowan's lease agreement.

124. Defendant did not include an accompanying form captioned "Notice of Cancellation" in the lease agreements enrolling Ms. Rowan in RentPlus.

125. Ms. Rowan was unenrolled in RentPlus after her lease terminated in April 2026 per RentPlus's terms of service.

## CLASS ACTION ALLEGATIONS

126. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

127. Plaintiffs assert claims on behalf of and seek to represent a Class of all consumers enrolled in RentPlus within the statute of limitations and a subclass of Colorado consumers enrolled in RentPlus within the statute of limitations.

128. Plaintiffs reserve the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

129. **Numerosity**: The Classes are so numerous that joinder of all class members is impracticable. The apartment complexes where Plaintiffs have resided during the class period alone have several hundred units, approximately 80% of which are enrolled in RentPlus according to RentPlus's data. Accordingly, while the current number of class members is unknown, Plaintiffs

estimate that it is likely in the thousands or more. The precise number can be easily identified based on Defendant's records.

130. **Commonality**: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

a. whether Defendant is a CRO;

b. whether Defendant violates the CROA and/or CCSOA through imposition of advanced fees;

c. whether Defendant violates the CROA and/or CCSOA for failing to make required disclosures;

d. whether Defendant violates the CROA and/or CCOSA through its deceptive negative option provisions;

e. whether Defendant violates the CCPA through its deceptive negative option provisions

f. whether Rent Dynamics was unjustly enriched by deceptively enrolling consumers in its services; and

g. the proper measure of damages and/or other forms of relief.

131. These common questions arise, in part, because of the uniform circumstances under which Plaintiffs and the Classes were enrolled in and charged by RentPlus for its rental reporting services. These include RentPlus's common practice of negative-option enrollment, the representations made by Rent Dynamics to consumers on RentPlus's website, and the common service RentPlus provided and/or failed to provide to Plaintiffs and the Classes.

132. **Typicality**: Plaintiffs' claims are typical of the members of the Classes because Plaintiffs were subject to and harmed by Defendant's advanced fees and nondisclosures within the statute of limitations, and Defendant treated them consistently with other class members in accordance with its standard policies and procedures.

133. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the prosecution of this action and have retained counsel with extensive experience in class actions. There are no conflicts between Plaintiffs or Plaintiffs' counsel and the Classes Plaintiffs seek to represent.

134. **Predominance and Superiority**: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant uses a lease addendum and website Terms of Use that are uniform as to all relevant terms, and engages in uniform practices that result in common violations of law. Declaratory, equitable, and injunctive relief are appropriate with respect to Plaintiff and members of the Classes as a whole. Joinder of all members of the Class is impracticable, and class certification will promote efficiency by eliminating the complication and expense of duplicative litigation that might overwhelm the courts and result in inconsistent judgments concerning Defendant's practices. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## COUNT I : CREDIT REPAIR ORGANIZATIONS ACT (Untrue or Misleading Representation)

## 15 U.S.C. § 1679b(a)(3)

**(Plaintiffs on behalf of themselves and the Nationwide Class against Defendant)**

135. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

136. Defendant was a credit repair organization pursuant to the CROA.

137. Plaintiffs were consumers pursuant to the CROA.

138. Defendant uses the internet and consumers' lease agreements to sell, provide and perform RentPlus's services.

139. Defendant automatically enrolls consumers in RentPlus by burying a negative option agreement in consumer leases.

140. Defendant's actions constitute a misleading representation because its standard lease addendum positions its product as a benefit to tenants, but in fact PMCs receive a significant kickback each month for luring unsuspecting tenants into enrolling in RentPlus.

141. Defendant's standard addenda create the appearance that Defendant's product is truly a third-party service and amenity that provides benefits to tenants—rather than disclosing that there is an inflated fee paid to the PMCs.

142. Moreover, Defendant enrolls and charges consumers for services consumers are unaware of and which Defendant knows consumers would likely not choose to opt in if expressly informed of RentPlus services.

143. Therefore, Defendant's acts constitute misleading practices in violation of 15 U.S.C. § 1679b(a)(3).

144. Plaintiffs were harmed by this practice.

145. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1679g.

**COUNT II : CREDIT REPAIR ORGANIZATIONS ACT (Fraud or Deception)**

**15 U.S.C. § 1679b(a)(4)**

**(Plaintiffs on behalf of themselves and the Nationwide Class against Defendant)**

146. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

147. Defendant was a credit repair organization pursuant to the CROA.

148. Plaintiffs were consumers pursuant to the CROA.

149. Defendant uses the internet and consumers' lease agreements to sell, provide and perform RentPlus's services.

150. Defendant automatically enrolls consumers in RentPlus by burying a negative option agreement in consumer leases.

151. Defendant's actions constitute a deception because it enrolls and charges consumers for services consumers are unaware of and which Defendant knows consumers would likely not choose to opt into if expressly informed of RentPlus services.

152. Therefore, Defendant's acts constitute deceptive practices in violation of 15 U.S.C. § 1679b(a)(4).

153. Plaintiffs were harmed by this practice.

154. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1679g.

**COUNT III: CREDIT REPAIR ORGANIZATIONS ACT (Advanced Fees)**

**15 U.S.C. § 1679b(b)**

**(Plaintiffs on behalf of themselves and the Nationwide Class against Defendant)**

155. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

156. Defendant was a credit repair organization pursuant to the CROA.

157. Plaintiffs were consumers pursuant to the CROA.

158. Defendant uses the internet and consumers' lease agreements to sell, provide and perform RentPlus's services.

159. Automatic monthly fees for RentPlus that Defendant has imposed on Plaintiffs and others similarly situated are illegal advanced fees because Defendant charges consumers before fully performing rent payment reporting to credit bureaus.

160. Defendant's actions constitute intentional violations of the CROA within the meaning of 15 U.S.C. § 1679g(b).

161. Plaintiffs were harmed by this practice.

162. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1679g.

**COUNT IV: CREDIT REPAIR ORGANIZATIONS ACT (Failure to Disclose)**

**15 U.S.C. § 1679c**

**(Plaintiffs on behalf of themselves and the Nationwide Class against Defendant)**

163. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

164. Defendant was a credit repair organization pursuant to the CROA.

165. Plaintiffs were consumers pursuant to the CROA.

166. Defendant uses the internet and consumers' lease agreements to sell, provide and perform RentPlus's services.

167. Defendant violated 15 U.S.C. § 1679c by unlawfully failing to make required disclosures on the RentPlus website and in consumers' lease agreements.

168. On Defendant's RentPlus website, the Terms of Use contains none of the specific language required or disclosures concerning consumer rights under 15 U.S.C. § 1679c.

169. On Defendant's lease addendums enrolling Plaintiffs and Class Members in RentPlus, the agreement does not contain any of the specific language required for disclosures concerning consumer rights under 15 U.S.C. § 1679c.

170. By failing to make required disclosures on both the RentPlus website and lease addendums, Defendant failed to comply with the disclosure requirements of the CROA.

171. Defendant's actions constitute intentional violations of the CROA within the meaning of 15 U.S.C. § 1679g(b).

172. Plaintiffs were harmed by this practice.

173. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1679g.

## COUNT V: COLORADO CREDIT SERVICES ORGANIZATION ACT

C.R.S. § 5-19-104(1)(a) (Prohibited Acts, Advanced fees)

**(Plaintiffs on behalf of themselves and the Nationwide Class against Defendant)**

174. Plaintiff incorporates by reference all previous paragraphs of this Complaint.

175. Defendant was a credit repair organization pursuant to the CROA.

176. Plaintiffs were consumers pursuant to the CROA.

177. Defendant uses the internet and consumers' lease agreements to sell, provide and perform RentPlus's services.

178. Defendant violated C.R.S. § 5-19-104(1)(a) by unlawfully charging and receiving money from Plaintiffs and class members prior to full and complete performance of rent reporting and credit improvement Defendant agreed to perform for Plaintiffs and class members.

179. Defendant's actions are a willful violation of the CCSOA within the meaning of C.R.S. § 5-19-111(2).

180. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees pursuant to C.R.S. § 5-19-111(1)-(2).

**COUNT V: COLORADO CREDIT SERVICES ORGANIZATION ACT**

C.R.S. § 5-19-104(1)(c) (Prohibited Acts, Deceptive Practices)

**(Plaintiffs on behalf of themselves and the Colorado Class against Defendant)**

181. Plaintiff incorporates by reference all previous paragraphs of this Complaint.

182. Defendant was a credit services organization pursuant to the CCSOA.

183. Plaintiff was a buyer pursuant to the CCSOA.

184. Defendant automatically enrolls consumers in RentPlus by burying a negative option agreement in consumer leases.

185. Defendant's actions constitute a deception because it enrolls and charges buyers for services they are unaware of and which Defendant knows consumers would likely not choose to opt into if expressly informed of RentPlus's services.

186. Therefore, Defendant's acts constitute a deception upon any person in connection with the offer or sale of the services of a credit services organization in violation of C.R.S. § 5-19-104(1)(c).

187. Defendant's actions are a willful violation of the CCSOA within the meaning of C.R.S. § 5-19-111(2).

188. Plaintiffs were harmed by this practice.

189. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees and cost of suit pursuant to C.R.S. § 5-19-111(1)-(2).

**COUNT VI: COLORADO CREDIT SERVICES ORGANIZATION ACT**

C.R.S. § 5-19-105 (Written disclosure required)

**(Plaintiffs on behalf of themselves and the Colorado Class against Defendant)**

190. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

191. Defendant was a credit services organization pursuant to the CCSOA.

192. Plaintiffs were buyers pursuant to the CCSOA.

193. Defendant violated C.R.S. § 5-19-105 by unlawfully failing to make required written disclosures under C.R.S. § 5-19-106 on the RentPlus website and in consumers' lease agreements.

194. On Defendant's RentPlus website, the Terms of Use contain none of the specific language or required disclosures concerning consumer rights under C.R.S. § 5-19-106.

195. On Defendant's lease addendums enrolling Plaintiffs and Class Members in RentPlus, the agreement does not contain any of the specific language required for disclosures under C.R.S. § 5-19-106.

196. Defendant has also not maintained exact copies of disclosures personally signed by buyers acknowledging receipt of a copy of the disclosures as required by C.R.S. § 5-19-105 because Defendant routinely failed to obtain buyers' signatures before enrolling them in RentPlus.

197. By failing to make required disclosures on both the RentPlus website and lease addendums, in addition to failing to obtain a copy of the statement personally signed by the buyers acknowledging receipt of a copy of the statement, Defendant failed to comply with the disclosure requirements of the CCSOA.

198. Defendant's actions constitute willful violations of the CCSOA within the meaning of C.R.S. § 5-19-111(2).

199. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees and costs pursuant to C.R.S. § 5-19-111(1)-(2).

## COUNT VIII: COLORADO CREDIT SERVICES ORGANIZATION ACT

C.R.S. § 5-19-107 (Written contracts required)

**(Plaintiffs on behalf of themselves and the Colorado Class against Defendant)**

200. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

201. Defendant was a credit services organization pursuant to the CCSOA.

202. Plaintiffs were buyers pursuant to the CCSOA.

203. Defendant violated the requirements set forth in C.R.S. § 5-19-107 each time a buyer was automatically enrolled in RentPlus without having signed and dated the provision enrolling the buyer in RentPlus.

204. Defendant further violated the requirements in C.R.S. § 5-19-107 by failing to include a conspicuous statement in bold-faced type next to the signature the terms identified in C.R.S. § 5-19-107(1)(a)-(c).

205. Defendant also violated the requirements in C.R.S. § 5-19-107(2) by failing to accompany the lease agreements with a completed form captioned "Notice of Cancellation" that includes the required terms in bold-faced type.

206. Defendant's actions constitute willful violations of the CCSOA within the meaning of C.R.S. § 5-19-111(2).

207. Plaintiffs and others similarly situated are entitled to recover actual damages, punitive damages, and reasonable attorneys' fees and costs pursuant to C.R.S. § 5-19-111(1)-(2).

## COUNT IX: COLORADO CONSUMER PROTECTION ACT

## C.R.S. § 6-1-101 *et seq.*

**(Plaintiffs on behalf of themselves and the Colorado Class against Defendant)**

208. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

209. Under the Colorado Consumer Protect Act "a person engages in a deceptive trade practice when, among other acts, in the course of the person's business, vocation or occupation":

> (u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction;
>
> (rrr) Either knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice.

C.R.S. § 6-1-105.

210. In violation of these subsections, Defendant knowingly or recklessly engaged in unfair, deceptive, and unconscionable acts and practices.

211. Defendant knowingly or recklessly engaged in deceptive acts and practices by burying a negative-option enrollment provision in small, inconspicuous print within a dense lease agreement that otherwise addressed mandatory, housing-related terms.

212. Defendant knew that consumers would be unlikely to affirmatively choose these services if given a clear opportunity to do so and therefore concealed the enrollment provision to deceive consumers into enrolling in an unwanted service, one they would likely never realize they were being charged for, reasonably believing they had agreed only to a residential lease, not to a separate and unrelated credit program designed to generate ancillary income for landlords.

213. Defendant has also acted unconscionably. Procedurally, the negative option enrollment provision was buried in a form lease, which is largely non-negotiable and presented on a take-it-or-leave-it basis. It is provided to prospective tenants for review after they have already paid hundreds of dollars in application fees, administrative fees, and potentially additional

amounts, like the first month's rent, any pro-rated rent, and any security deposit(s). The negative option enrollment provisions were buried in a form lease, routinely exceeding 45 pages in length and largely written in "legalese."

214. The enrollment provision is substantively unconscionable because it imposes a fee that bears no reasonable relationship to the actual cost or value of the benefit provided. The amount charged exceeds the cost of providing the service and delivers only minimal benefit to consumers. The provision is further substantively unconscionable because it is largely unrelated to housing-related matters of the lease and instead imposes a payment for a secondary credit service that has no meaningful connection to renting an apartment.

215. To the extent required by Colorado law, Plaintiffs allege that Defendant's unlawful conduct and other violations of the CCPA set forth above significantly impact the public.

216. The number of consumers directly affected by the challenged practices is significant and growing. The auto-enrollment provisions are included on leases for at least 230 residents in Colorado living at either the Vega or Carrick Bend apartments. However, Berkshire Residential Investment Properties, which owns Carrick Bend, also owns four additional properties in Colorado that total 1,357 units that likely impose the same RentPlus provisions in each tenant's lease agreement.

217. These consumers are often substantially less sophisticated than Defendant. Participating landlords possess overwhelming bargaining power in the transaction, particularly where the auto-enrollment provision is disclosed only after the consumer has invested significant time and money to secure the apartment. Defendant consequently exploits consumers' vulnerability in this transaction by burying an auto-enrollment provision for credit repair services in a context where a reasonable consumer would not expect such a provision to appear.

218. In addition, Defendants are implementing this practice into leases of property management companies that are significant players in Colorado's residential market. Its practices of auto-enrolling tenants significantly impacts how others behave in the market. Colorado consumers who rent property in the state face an affordability crisis, and the fees consumers pay as a result of the auto-enrollment practices make leasing less affordable for potentially thousands of Coloradans.

219. Defendant has engaged in or caused others to engage in the deceptive trade practices set forth above, and Plaintiffs and the Class members are consumers or potential consumers subjected to the negative option enrollment provisions for Defendant's RentPlus services.

220. Pursuant to C.R.S. § 6-1-113(2.9), Plaintiffs seek, on behalf of themselves and the Class, all actual damages suffered as a result of the deceptive trade practices in amounts to be proven at trial, injunctive relief allowed by law, and an award of reasonable attorneys' fees and costs.

## COUNT X: UNJUST ENRICHMENT

**(Plaintiffs on behalf of themselves and the Colorado Class against Defendant)**

221. Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

222. Defendant has been unjustly enriched through the charging and collection of fees for RentPlus.

223. Plaintiffs and other consumers have conferred benefits on Defendant in the form of fees for RentPlus, a service which they did not want or know they were enrolled in, which creates circumstances where Defendant should not be permitted under principles of equity and good conscience to retain such fees.

224. Plaintiffs, on behalf of themselves and the Class, pray for an Order of Judgment disgorging Defendant of all amounts collected and retained as a result of fees for Rent Plus and returning such fees to the Plaintiffs and other Class Members and for such additional relief as the Court deems necessary and just.

**PRAYER FOR RELIEF**

225. Plaintiffs respectfully request that the Court:

a. Certify the case as a class action on behalf of the proposed class;

b. Designate Plaintiffs as class representatives;

c. Designate Plaintiffs' counsel of record as class counsel;

d. Certify the case as a collective action on behalf of the proposed collective;

e. Declare that Defendant's conduct is illegal under the various statutes cited here;

f. Preliminarily and permanently enjoin Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

g. Award Plaintiffs damages, including punitive damages, in an amount subject to proof at trial;

h. Award Plaintiffs' counsel costs incurred herein, including reasonable attorneys' fees to the extent allowable by law; and

i. Provide such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: June 1, 2026

Respectfully submitted,

/s/ Rachel Dempsey

Rachel Dempsey, Atty Reg. No. 57708
Toree Lindblad, Atty Reg. No. 62375
Seth Froman, *pro hac vice* forthcoming
TOWARDS JUSTICE
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO, 80203-1994
Telephone: (720) 441-2236
rachel@towardsjustice.org
toree@towardsjustice.org
seth@towardsjustice.org

Kristi C. Kelly, *pro hac vice* forthcoming
Andrew J. Guzzo, *pro hac vice* forthcoming
KELLY GUZZO, PLC
3925 Chain Bridge, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Counsel for Plaintiffs and the Proposed Classes*